IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGIN/IA
Harrisonburg Division

| | | |
|---|---|---|
| CAROLYN WERNER, on behalf of | ) | |
| A.L.M., a minor child, Plaintiff, | ) | |
| | ) | Civil Action No. 5:15-cv-22 |
| v. | ) | |
| | ) | <u>MEMORANDUM OPINION</u> |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner, | ) | By:    Joel C. Hoppe |
| Social Security Administration, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Carolyn Werner, on behalf of Plaintiff A.L.M., a child under the age of eighteen, asks

this Court to review the Commissioner of Social Security's ("Commissioner") final decision

denying A.L.M.'s application for supplemental security income ("SSI") under Title XVI of the

Social Security Act, as amended ("The Act"), 42 U.S.C. § 1381, *et seq.*; 20 C.F.R. § 416.1481.

The case is before me by the parties' consent under 28 U.S.C. § 636(c)(1). Having considered the

administrative record, the parties' briefs and oral arguments, and the applicable law, I find that

the Commissioner's decision is not supported by substantial evidence and that the case must be

remanded for further administrative proceedings.

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v.*

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court

asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

1

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person under the age of eighteen is "disabled" under the Act if he or she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). Social Security ALJs follow a three-step process to determine whether an applicant under the age of eighteen is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; and (3) has an impairment that meets or equals an impairment listed in the Act. 20 C.F.R. § 416.924. If the ALJ determines that the child has a severe impairment, at step three the ALJ must compare how appropriately, effectively, and

2

independently the child performs activities compared to other children of the same age without such impairments. 20 C.F.R. § 416.926a(b). In doing so, the ALJ must ascertain which of six domains of functioning are implicated and rate the severity of the limitations in each affected domain. *Id.* The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for himself or herself; and (6) health and physical well-being. *Id.* To functionally equal the listings, the child's impairment or combination of impairments must result in a "marked" limitation in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d). The applicant bears the burden of proving disability. *See* 20 C.F.R. § 416.912(a).

## II. Procedural History

Werner, on behalf of A.L.M., filed for SSI on August 12, 2011. Administrative Record ("R.") 78, ECF No. 10. A.L.M. was nine years old at the time. *Id.* He alleged disability beginning at his birth on February 21, 2002, because of post traumatic stress disorder and autism. *Id.* On February 11, 2013, he amended the disability onset date to August 1, 2011. R. 162. Disability Determination Services ("DDS"), the state agency, denied his claim initially and on reconsideration. R. 78–86, 87–96. A.L.M. appeared with Werner and his counsel at an administrative hearing on February 15, 2013. R. 47–77. He testified regarding his daily activities, his performance in school, and his physical capabilities. R. 56–62. Werner, who is A.L.M.'s grandmother, also testified regarding his medication, school performance, and daily activities. R. 63–77.

Case 5:15-cv-00022-JCH   Document 21   Filed 09/23/16   Page 3 of 23   Pageid#: 567

The ALJ denied A.L.M.'s application in a written decision dated June 28, 2013. R. 20–41. He found that A.L.M. had severe impairments of Asperger Syndrome,[1] Attention Deficit Hyperactivity Disorder ("ADHD"),[2] and pervasive developmental disorder.[3] R. 23. He determined that these impairments, alone or in combination, did not meet or equal a listing pursuant to 20 C.F.R. §§ 416.924 and 416.926a. R. 23–41. Assessing the six functional domains, the ALJ concluded that A.L.M. had marked limitation in attending and completing tasks, but less than marked limitation in acquiring and using information, interacting and relating with others, moving and manipulating objects, and caring for himself, and no limitation in health and physical well-being. R. 34–40. He therefore determined that A.L.M. was not disabled under the Act. R. 41. The Appeals Council declined to review that decision, R. 1–5, and this appeal followed.

### III. Statement of Facts

*A.    Medical Evidence*

Kenneth Norwood, M.D., evaluated A.L.M. for autism on August 11, 2011. R. 292–96. Dr. Norwood diagnosed A.L.M. with Autism Spectrum Disorder and noted that he thought

---

[1]  The American Psychiatric Association's Diagnosis and Statistical Manual of Mental Disorders previously considered Asperger Syndrome an independent disorder, but now considers it part of autism spectrum disorder, which is "a serious neurodevelopmental disorder that impairs a child's ability to communicate and interact with others." Mayo Clinic, *Autism Spectrum Disorder* (June 3, 2014), http://www.mayoclinic.org/diseases-conditions/autism-spectrum-disorder/basics/definition/con-20021148. Asperger's has been "generally thought to be at the mild end of the autism spectrum disorder." *Id.*

[2]  ADHD is "a chronic condition . . . [that] includes a combination of persistent problems, such as difficulty sustaining attention, hyperactivity and impulsive behavior." Mayo Clinic, *Attention-Deficit/Hyperactivity Disorder (ADHD) in Children* (Mar. 11, 2016), http://www.mayoclinic.org/diseases-conditions/adhd/home/ovc-20196177.

[3]  Similar to Asperger Syndrome, pervasive developmental disorder used to be considered a separate disorder but is now part of autism spectrum disorder. Mayo Clinic, *Autism Spectrum Disorder* (June 3, 2014), http://www.mayoclinic.org/diseases-conditions/autism-spectrum-disorder/basics/definition/con-20021148.

4

Asperger Syndrome was the most likely fit. R. 295. Dr. Norwood evaluated A.L.M. in person, reviewed a questionnaire filled out by A.L.M.'s grandparents, and discussed A.L.M. with his family. R. 292. At the time of the evaluation, A.L.M. was nine years old, but his grandmother noted that he acted like a five-year-old and had very poor social interaction. *Id.* He was, however, on time for development and talking and could follow directions. *Id.* He had difficulty with eye contact and would often get easily sidetracked. *Id.* Further, he had difficulty understanding body language and jokes and had no friends at school. R. 293. He did play with his brother, watched a lot of television, played pretend, and enjoyed swimming. *Id.* A.L.M. was at an appropriate grade level for all academics and loved reading. R. 294. A.L.M. had variable and often fleeting eye contact, poor prosody, and some hand flapping. *Id.* He had abnormal muscle tone and abnormal coordination, was a slow, awkward runner, and was unable to skip. R. 295. A.L.M. had mood issues related to significant neglect early in his life and his inability to make friends, but Dr. Norwood expressed the opinion that the autism spectrum disorder was unrelated to the neglect. R. 295–96. Dr. Norwood provided A.L.M.'s grandparents with an autism packet, suggested that he would benefit from an individualized education program ("IEP"), and encouraged extracurricular activities "to help with socialization and motor development." R. 296.

On July 31, 2012, A.L.M. visited the University of Virginia ("UVA") Hospital for a follow-up appointment. R. 417–22. His grandmother was concerned that A.L.M. was worsening because he would get frustrated and would blow up when fighting with his brother. R. 421. Additionally, A.L.M. had not interacted with other children during a school field trip. *Id.* A.L.M.'s grandmother reported that he was on level for reading and spelling, but not for math. *Id.* She requested a counselor for A.L.M. given her concerns about his behavior. *Id.*

A.L.M. began seeing Valeri Pineo, a Licensed Professional Counselor, at Augusta Psychological Associates on August 16, 2012. R. 347. Ms. Pineo performed an intake evaluation, noting A.L.M.'s family history was significant for numerous mental illnesses and that his grandmother reported he had "lived in chaos" since a very early age. *Id.* A.L.M. had been diagnosed with ADHD, but his grandmother refused to give him medication to treat it. *Id.* A.L.M. reportedly did well in school, and, despite his shyness with peers, his grandmother denied he had major social issues. *Id.* Ms. Pineo noted that A.L.M. was extremely guarded with poor eye contact and a flat and depressive affect, but suicidal ideation, self-harm gestures, and psychotic symptoms were denied. R. 348. A.L.M. refused to speak, so she found his genuine level of cognitive processing to be unknown, but noted he appeared oriented to the place and situation. *Id.* She also noted that A.L.M. had never been in counseling, except for a counselor at school. *Id.* Ms. Pineo diagnosed A.L.M. with adjustment disorder, assigned him a Global Assessment of Functioning ("GAF")[4] score of 61,[5] and recommended further counseling. *Id.*

A.L.M. visited Ms. Pineo three times in September 2012. On September 13, Ms. Pineo noted that A.L.M. was oriented and cooperative and that he had the ability to care for himself. R.

---

[4] GAF scores represent a "clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (*DSM-IV*). The GAF scale is divided into ten 10-point ranges reflecting different levels of symptoms or functioning, with 1–10 being the most symptomatic or least functional, and 91–100 being the least symptomatic or most functional. *See id.* The ranges do not distinguish between symptoms and functional impairments. *See id.* Thus, when "the individual's symptom severity and level of functioning are discordant, the final GAF [score] always reflects the worse of the two." *Id.* at 32–33.

The American Psychiatric Association now cautions that GAF scores do not adequately convey the information needed to assess an individual's mental state, functional capacities, or treatment needs over time, and it recommends that clinicians cease using them for assessment. *See* Am. Psychiatric Ass'n, *Frequently Asked Questions About DSM-5 Implementation–For Clinicians* (Aug. 1, 2013), http://www.dsm5.org/Documents/FAQ%20for%20Clinicians%208-1-13.pdf.

[5] A GAF score of 61–70 indicates "some mild symptoms (e.g., depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV* at 34.

6

349. She noted that he was anxious, but that he allowed her to call him by his name, R. 349, which he had not allowed at their previous meeting, R. 347. On September 21, A.L.M. was oriented, but hyperactive, distractible, and anxious, and Ms. Pineo noted these behaviors are often present in children who have Asperger Syndrome. R. 350. A.L.M. had difficulty completing and handing in work at school, but he would quickly verbalize excuses in his defense. *Id.* She noted that he was still able to care for himself. *Id.* On September 25, A.L.M. was oriented and cooperative, although he remained hyperactive and anxious, and he exhibited a flight of ideas. R. 351. At all three appointments, Ms. Pineo's plan for the future included establishing healthy boundaries with self and others, relaxation techniques, and communication and coping skills. R. 349–51.

On October 26, 2012, A.L.M. returned for another session with Ms. Pineo. R. 352. A.L.M. was oriented, his affect was anxious and flat, and he was cooperative despite being agitated. *Id.* Ms. Pineo noted that he continued to struggle with task completion, especially when he arrived home from school, and Ms. Pineo suggested making a schedule. *Id.* Ms. Pineo felt that Werner "needs to be needed" by A.L.M. and encouraged his separation anxiety. *Id.* She noted that despite his pervasive anxiety symptoms and Asperger Syndome, he was capable of being much more independent than he currently was, and Ms. Pineo believed that Werner created a "culture of fear," which caused A.L.M. to fear trying things on his own. *Id.* Werner also blamed others for any failure by A.L.M. and encouraged his reluctance to try again by telling him he is "fine the way he is." *Id.*

In November, A.L.M. returned for therapy with Ms. Pineo three times. On November 6, Ms. Pineo noted that A.L.M. had a restricted range of interests, was oriented, had an appropriate but anxious affect, and was hyperactive but cooperative. R. 354. On November 16, Ms. Pineo

7

noted that A.L.M. had separation anxiety when he was away from his grandmother and he had a difficult time when he visited his father because the loud and busy household over-stimulated and exacerbated his anxiety. R. 355. She felt that A.L.M. was an excellent candidate for medication given his extremely high anxiety level, but noted that A.L.M.'s grandmother was resistant. *Id.* He was oriented, anxious and euphoric, and again hyperactive but cooperative. *Id.* On November 30, Ms. Pineo found that A.L.M. continued to struggle with social situations, particularly at school. R. 357. She also noted that A.L.M.'s grandmother encouraged and facilitated A.L.M.'s dependence on her and reinforced his separation anxiety. *Id.* Ms. Pineo again recommended medication, and A.L.M.'s grandmother continued to be resistant. *Id.* A.L.M. was oriented, but had a flight of ideas and was anxious and euphoric. *Id.* He was also cooperative but hyperactive, and displayed hand flapping. *Id.* Throughout November, Ms. Pineo continued to note that A.L.M. was able to care for himself. R. 354–58.

In December, A.L.M. had two sessions with Ms. Pineo. On December 5, A.L.M. told Ms. Pineo that things at school were improving. R. 359. Ms. Pineo continued to note that A.L.M.'s grandmother encouraged his dependence upon her. *Id.* He was oriented, cooperative, and able to care for himself, but he was also anxious and hyperactive. *Id.* On December 28, Ms. Pineo noted that A.L.M. was continuing to have issues with dependence on his grandmother and a high anxiety level, as well as inattention and impulsivity. R. 361. He displayed a flight of ideas, was anxious and euphoric, and, although cooperative, was again hyperactive. *Id.*

In November and December 2012, Gerald McKeegan, Ph.D., a licensed clinical psychologist, met with A.L.M. three times for neuropsychological testing. R. 343–45. Summarizing the results of this testing, Dr. McKeegan noted that A.L.M. had average intellectual function, but had scores indicative of attention and concentration deficits. R. 345. Dr.

8

McKeegan diagnosed him with attention-deficit disorder ("ADD") and noted that he would be seen in a few weeks for medication. *Id.* As part of the mental status examination, Dr. McKeegan noted that A.L.M. exhibited an appropriate appearance and casual behavior and was alert and oriented times three. *Id.* He also had grossly intact memory and concentration, and he exhibited a logical and linear thought process. *Id.* A.L.M. had an odd cadence and tone to his speech and an anxious mood and affect, but his mood was congruent, had full range, and was appropriate. R. 346. His judgment and insight were both fair. *Id.*

In January 2013, A.L.M. saw Ms. Pineo for counseling sessions four more times. On January 2, Ms. Pineo noted that A.L.M. was failing most of his classes at school and explained that he had a solid intellect, but was extremely disorganized and seemed incapable of studying effectively. R. 363. They brainstormed ways to increase his awareness and organization. *Id.* A.L.M. expressed a desire for his grandmother to homeschool him, but Ms. Pineo cautioned against doing so because he needed to learn how to navigate social situations. *Id.* She noted that he was high-functioning and intelligent, but lacked social awareness and exhibited low self-esteem. *Id.* They met again on January 4. R. 369–71. A.L.M.'s appearance was appropriate and he was cooperative. R. 370. His speech was high pitched, and his mood anxious and congruent. R. 371. His thought process was circumstantial, but his thought content was appropriate and intelligent, and his insight and judgment were intact. *Id.* She noted that he was a very pleasant boy. R. 371. A.L.M. had some social skills deficits causing children to target and ridicule him. *Id.* He also had difficulties in school caused by his ADHD, and he was failing social studies and math. R. 369. Ms. Pineo expressed her opinion that a trial of a stimulant would be helpful. R. 371. On January 10, A.L.M. continued to struggle in school and push for homeschooling. R. 365. They discussed medication, and Ms. Pineo explained that medication could be beneficial,

but A.L.M.'s grandmother continued to be resistant. *Id.* A.L.M. was preoccupied with cartoons and attempted to watch them on Ms. Pineo's computer. *Id.* During the session on January 15, Ms. Pineo found that A.L.M. continued to perform poorly in school and was easily distracted and overstimulated, exhibiting rigidity and hyper-focus. R. 367. Ms. Pineo also noted that A.L.M.'s grandmother often made excuses for his inability to work rather than helping him achieve. *Id.* A.L.M.'s dependence on his grandmother was noted again, exemplified by A.L.M. saying he "needs" her. *Id.* His grandmother also had not given him any of the medication he had been prescribed. *Id.* Throughout January, A.L.M. was oriented, cooperative, and able to care for himself. R. 363–67. He continued to be anxious and hyperactive, however, and sometimes displayed agitation, a flight of ideas, and hand flapping behavior. *Id.*

On January 17, 2013, A.L.M. and his grandmother met with David Meyer, D.O., for medication evaluation and management. R. 372–77. Dr. Meyer assessed A.L.M. with Asperger Syndrome, attention difficulties, and having trouble in school. R. 376. A.L.M.'s grandmother had not filled his Methylin prescription because she was opposed to the medication and concerned with future drug dependence. R. 372. Dr. Meyer explained that children who are treated for ADHD are less likely to abuse drugs. *Id.* Dr. Meyer suggested a trial of Strattera as opposed to stimulants, given the grandmother's reluctance, but noted that A.L.M. would need to overcome his difficulty swallowing pills. *Id.* A.L.M.'s appearance was appropriate, he was cooperative, and his speech was normal. R. 374. His mood was euthymic and congruent, and his thought process was circumstantial with no abnormal content. *Id.* His insight and judgment were intact, and he was alert and orientated times three. R. 374–75. His memory, concentration, and language were intact. R. 375. His language was abstract, and his fund of knowledge was average. *Id.*

Ms. Pineo completed a form regarding A.L.M.'s ability to do school-related activities on February 8, 2013. R. 378–80. She wrote that A.L.M had mild impairment in understanding, remembering, and carrying out simple instructions. R. 378. She marked that A.L.M. had moderate impairment in his ability to make judgments on simple school-related decisions, his ability to understand, remember, and carry out complex instructions, and his ability to make judgments on complex school-related decisions. *Id.* In support of these findings she noted that he was diagnosed with Asperger Syndrome by the Kluge Center at UVA, and she agreed with the diagnosis. *Id.* She noted that one of the hallmarks of Asperger Syndrome is a persistent preoccupation with a restricted range of interests and activities, which interfered with A.L.M.'s ability to pay attention and listen effectively. *Id.* She noted that A.L.M.'s impairment affected his ability to interact appropriately under supervision, with classmates, and with the public, and his impairment limited his ability to respond to changes in routine. R. 379. She noted a "marked" impairment in his ability to interact appropriately with the public, his teachers, and his classmates, and an "extreme" impairment in his ability to respond appropriately to usual school situations and changes in a routine school setting. *Id.* She wrote that children with Asperger Syndrome do not develop peer relationships appropriate to their developmental level, often lack social and emotional reciprocity, and do not understand the nuances of nonverbal communication, which causes marked social impairment. *Id.* She also noted that A.L.M. could not cope with changes in schedules and routines. *Id.* He had an extremely rigid personality and could not manage unexpected situations without exhibiting panic symptoms, resulting in behavior inappropriate to the situation. *Id.* She noted that A.L.M. would exhibit bizarre behaviors at home, at school, and in the community. *Id.* Ms. Pineo also noted that she did not think A.L.M.

could manage benefits in his own best interests, which should be considered as he approaches adulthood. R. 380.

On February 13, 2013, Ms. Pineo submitted a letter regarding A.L.M.'s Asperger Syndrome and noted that his symptoms and limitations placed him toward the high end of the spectrum, indicating severe symptoms. R. 404. She noted that A.L.M. often shrieked repeatedly, disrupted other therapists and their clients, and repeatedly forgot how far his high-pitched voice could carry indoors. *Id.* She explained that A.L.M. did not possess the social awareness of his peers and was oblivious to the nuances of nonverbal communication. *Id.* A.L.M. often blurted out spontaneous noises and engaged in embarrassing activities repeatedly when in public, such as nose picking, inappropriate scratching of self, repeatedly passing gas, or making inappropriate comments. *Id.* She explained that his peers regarded him as "crazy" and "weird." *Id.* Further, she said he could not understand figurative language, which limited his ability to communicate, and phrases such as "hold your horses" often confused him. R. 404–05. She noted that A.L.M. exhibited high levels of impulsivity and distractibility that made it unsafe for him to be in the community without constant supervision. R. 405. For example, she doubted he would think twice before crossing the street without looking if something caught his eye, and she noted that he would engage in conversations with strangers, give them his private information, and grab things out of stranger's hands. *Id.* She felt heartbroken by his awareness of his social differences and explained that his inability to see himself through the eyes of his peers was one of the truest limitations he faced. *Id.* She noted that Asperger Syndrome is a lifelong condition, and she described the treatment for it as habilitative, rather than rehabilitative, meaning that treatment would allow him to function slightly more effectively, but he would not "get better." *Id.* She opined that he would require guardianship services once he was an adult and that his inability to

understand social norms would cause him to struggle academically, socially, and vocationally. R. 406.

On February 13, 2013, A.L.M. met with Dr. McKeegan for a comprehensive psychological assessment. R. 385–87. A.L.M. was not on any stimulant medication during the assessment. R. 385. Dr. McKeegan found that A.L.M. was a very pleasant ten-year-old male with average cognitive abilities. *Id.* A.L.M. exhibited a notable prosody problem in that he lacked inflection in his speech and had an odd intonation. *Id.* He was alert and easily engaged, and Dr. McKeegan thought he appeared to enjoy the interactions. *Id.* A.L.M. would hum to himself when attempting to solve more difficult tasks. *Id.* A.L.M.'s Wechsler Intelligence Scale for Children ("WISC–IV") scores ranged from 100 on verbal comprehension to 65 on working memory. *Id.* Dr. McKeegan found that the range of his scores and the significant differences among his scaled scores could indicate a learning disability and the results supported the possibility of ADD. *Id.* He fell into the Extremely Low Range for his ability to plan, organize, and change focus on relevant materials. *Id.* Dr. McKeegan expressed that A.L.M. may exhibit problems with attending and concentrating, particularly on verbal materials. *Id.* Despite having average verbal reasoning abilities, A.L.M.'s scaled score for the rate of learning verbally presented material fell within the Extremely Low Range. *Id.* However, he displayed average perceptual reasoning and verbal comprehension and a low average for processing speed. *Id.* Dr. McKeegan found that A.L.M. had relatively poor coordination and motor skills. R. 386.

As part of Dr. McKeegan's assessment, Werner provided information about A.L.M. for an Autism Spectrum Rating Scale ("ASRS"). R. 386, 388–403. The ASRS results showed that A.L.M. related well to adults, but had difficulty relating to children. *Id.* He had difficulty using appropriate verbal and nonverbal communication for social contact, would engage in unusual

Case 5:15-cv-00022-JCH   Document 21   Filed 09/23/16   Page 13 of 23   Pageid#: 577

behaviors, and exhibited inattention and problems with motor and impulse control. *Id.* A.L.M. also exhibited difficulty providing appropriate emotional responses in social situations, engaged in stereotypical behaviors, had difficulty tolerating changes in routine, and overreacted to sensory stimulation. *Id.* His unusual behaviors and self-regulation scores ranked in the very elevated range, and his social/communication scores ranked in the elevated range. Based upon his findings, Dr. McKeegan diagnosed A.L.M. with ADHD and Asperger Syndrome, with a history of abuse and neglect, and a lack of friends. R. 387. He assessed a GAF score of 64. *Id.*

A.L.M. met with Ms. Pineo once each in March and April 2013.[6] R. 463–64. On March 22, Ms. Pineo noted that he continued to fixate on her computer. R. 463. He continued to have difficulty with the kids at school, who were often mean to him. R. 463. He was oriented, but with a flight of ideas and was anxious, euphoric, and depressed. *Id.* He was cooperative, but hyperactive and withdrawn. *Id.* At this meeting Ms. Pineo felt that A.L.M. could not care for himself. *Id.* On April 5, 2013, Ms. Pineo reported that A.L.M. was doing much better in school. R. 464. He said that kids at school were still mean to him, but his relationship with his younger brother was better. *Id.* He was oriented with a flight of ideas and was anxious and flat. *Id.* He was cooperative and withdrawn. *Id.* At this meeting Ms. Pineo expressed that A.L.M. was capable of caring for himself. *Id.*

On March 14, 2013, A.L.M. met with Dr. Meyer to discuss medication. R. 466. Treatment notes indicate that Strattera caused A.L.M. headaches and he was concerned about wearing the Daytrana patch. *Id.* Dr. Meyer noted that A.L.M. was cooperative, with good eye contact, and normal psychomotor activity. R. 468. His appearance was appropriate, his speech

---

[6] Evidence from March 2013 forward, R. 462–96, was presented to the Appeals Council on February 27, 2015. R. 4. The hearing for A.L.M. took place on February 15, 2013, and evidence subsequent to this date was not part of the record before the ALJ. This court, however, considers the record as a whole, including any new evidence submitted to the Appeals Council. *Wilkins v. Sec'y of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

14

was normal, and his mood was euthymic and congruent. *Id.* His thought process was circumstantial without any abnormal content, but he had poor insight and impulse control. *Id.* He was drowsy, but oriented times three, and his memory and attention were intact. R. 469. His language was concrete and intact, and he maintained an average fund of knowledge. *Id.*

In April 2013 A.L.M. met with Dr. Meyer twice, and he noted the same exam findings as in March. During their first meeting in April, Dr. Meyer noted that that A.L.M. had not filled his medication because insurance would not cover it. R. 472. Dr. Meyer noted that he would submit a prior authorization form to help cover the medication. *Id.* At their second meeting, Dr. Meyer noted that the insurance had approved the prescribed medication and he was hopeful for success. R. 478.

A.L.M. continued to meet with Dr. Meyer in May and June 2013 with the same findings on exam. R. 486–87, 493–94. On May 15, Dr. Meyer noted that A.L.M. was doing better at school and was tolerating the medication, Focalin, well. R. 484. On June 26, Dr. Meyer noted that A.L.M. was doing very well on the Focalin without any side effects. R. 491. A.L.M.'s appetite and sleep had been good, and his grandmother stated that the medication helped his attention and focus as well as his impulsivity. *Id.*

B.    *Educational Evidence and Teacher Opinions*

On October 7, 2011, A.L.M.'s fourth grade teacher, Martina Carroll, filled out a teacher questionnaire analyzing his functioning in six domains: acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for himself, and health and physical well-being. R. 210–17. The form identified activities for each domain and asked for a rating of the child's functioning as compared to other children on a scale from "no problem" to "a very serious problem." R. 211. In

acquiring and using information, Ms. Carroll noted that A.L.M. had a very serious problem with expressing ideas in written form, and in all other areas, he had an obvious problem or a serious problem. *Id.* She explained that he needed to be given directions multiple times a day, received help switching classes, and generally needed "a lot of help throughout the day." *Id.* In attending and completing tasks, Ms. Carroll noted that A.L.M. had a serious or very serious problem in staying focused, completing tasks, and working at a reasonable pace. R. 212. In another questionnaire, Ms. Carroll indicated that A.L.M. could focus for five to ten minutes before he needed redirection. R. 223. He had no problem following single-step directions and changing activities or working without distracting others, a slight problem paying attention when spoken to directly or waiting to take turns, and an obvious problem sustaining attention at play and in carrying out multistep instructions. R. 212. As to interacting and relating with others, Ms. Carroll noted that A.L.M. had a very serious problem making and keeping friends, an obvious problem communicating and interpreting others' body language, and no problem playing cooperatively with children, following rules, and obeying adults. R. 213. As to moving about and manipulating objects, Ms. Carroll noted an obvious problem in all activities. R. 214. In caring for himself, Ms. Carroll noted no problem or problems on the lower end of the scale. R. 215. She offered additional comments that A.L.M. is a very sweet boy, but that he requires a lot of extra help with class work and age-appropriate manners. R. 217. Ms. Carroll also reported that A.L.M. was below grade level in reading, writing, and math. R. 210.

On January 2, 2013, A.L.M.'s fifth grade teacher, Adena Hickman, completed an "ADHD Diagnostic Teacher Rating" form. R. 255–58. She indicated that A.L.M. very often failed to give attention to details or made careless mistakes in school work, had difficulty paying attention to tasks and activities; had difficulty organizing tasks and activities, would leave his

seat when he was expected to remain seated, would talk excessively, and would shout out answers before listening to the question. R. 255. He was also fearful, anxious, or worried; blamed himself and felt guilty for his problems; felt lonely, unwanted, or unloved; complained that no one loved him; and often felt sad. R. 256. She noted that A.L.M. did not seem to listen when spoken to directly and was afraid to try new things for fear of making mistakes. R. 255. A.L.M. had difficulty waiting in line and occasionally had difficulty playing or engaging in leisure activities quietly. *Id.* She reported that he never lost his temper; was never angry or resentful; had never bullied, threatened, or intimidated others; was never physically cruel to others; and had never stolen items of nontrivial value. R. 255–56. She noted that he had problems academically with reading, mathematics, written expression, organization, assignment completion, and following directions or rules. R. 256. He did not disturb class more than an average student, but he had problems relating with his peers. *Id.*

C.      *State Agency Physicians' Opinions*

On October 24, 2011, Sandra Francis, Psy.D., evaluated A.L.M.'s record, including Ms. Carroll's completed questionnaire, as part of the state agency's review. R. 81–82. Dr. Francis found that his mood disorder was not severe, but his autistic disorder was severe. R. 81. She found a marked impairment in his ability to attend to and complete tasks; a less than marked impairment in acquiring and using information, interacting and relating with others, caring for himself, and moving about and manipulating objects; and no impairment in his health and physical well-being. R. 81–82. In discussing A.L.M.'s ability to attend and complete tasks, Dr. Francis noted that his teacher provided him a lot of assistance. R. 82. A.L.M. also had difficulty organizing materials and working at a consistent pace. *Id.* In evaluating how his impairment affected his ability to interact and relate with others, Dr. Francis considered his attachment to his

17

grandmother, fleeting eye contact, difficulty reading nonverbal communication, and limited interactive play and relationships with peers. *Id.* Dr. Francis nonetheless found that he did not have a marked impairment in this category because he was able to follow rules and express himself appropriately. *Id.* Dr. Francis concluded that his impairment did not meet, medically equal, or functionally equal the listings. R. 82.

On January 19, 2012, David L. Niemeier, Ph.D., reviewed the record as part of the state agency's reconsideration evaluation. R. 90–92. He also considered additional information provided by James Bunger, a DDS analyst, about his conversation with Ms. Carroll. R. 90. According to Mr. Bunger, Ms. Carroll reported that A.L.M. is well liked by his classmates, does not argue with them, and gets along well with them, but he also plays alone on the playground. *Id.* He had improved in reading, but not in math, and he still required extra assistance. *Id.* Dr. Niemeier concurred with Dr. Francis in all domains of functioning. *Id.* Dr. Niemeier noted that despite A.L.M.'s need for assistance, he was in a regular classroom and had improved in reading over the course of the year. R. 91. When discussing A.L.M.'s ability to interact and relate with others, Dr. Niemeier noted that his teacher found him "a joy to be around," his classmates liked him, and he had no behavior problems at school. *Id.*

## IV. Discussion

On appeal, A.L.M. argues that the ALJ wrongly denied his claim and cites three errors. First, A.L.M. alleges that the ALJ failed to give controlling weight to an opinion by his treating physician, Dr. Norwood. Pl. Br. 5, ECF No. 15. Second, he claims that the ALJ erred in giving the state agency medical opinions significant weight. *Id.* at 5–6. Third, A.L.M. contends that the ALJ failed to consider the opinions of his counselor and teacher as evidence to show the severity

of his impairments. *Id*. at 3–5. A.L.M. concludes that the ALJ incorrectly found that he has less than marked limitation in interacting and relating with others. *Id.* at 5–6.

A child functionally equals the listings if his or her impairment causes "marked" limitations in two domains of functioning or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a). A limitation is "marked" when an "impairment interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities. . . . [It] means a limitation that is 'more than moderate' but 'less than extreme.'" 20 C.F.R. § 416.926a(e)(2). A limitation is "extreme" when an "impairment interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities. . . . [It] means a limitation that is 'more than marked.' [It] is the rating [the Agency] give[s] to the worst limitations. . . . [but] does not necessarily mean a total lack or loss of ability to function." 20 C.F.R. § 416.926a(e)(2). The ALJ must consider the "whole child," and evaluate the child's functional capabilities in all settings compared to other children the same age who do not have impairments. SSR 09-1P, 2009 WL 396031, at *1–2 (Feb. 17, 2009).

In this case, the ALJ determined that A.L.M. has marked limitation in attending and completing tasks; less than marked limitation in acquiring and using information, interacting and relating with others, moving about and manipulating objects, and caring for himself; and no limitation in health and physical well-being. R. 32–40. A.L.M. takes issue with the finding that he has less than marked limitation is interacting and relating with others. Pl. Br. 5–6.

Interacting and relating with others concerns a child's ability to initiate and sustain emotional connections with others, develop and use language in the community, cooperate, comply with rules, respond to criticism, and respect and take care of others' possessions. 20 C.F.R. § 416.926a(i); SSR 09-5P, 2009 WL 396026, at *2 (Feb. 17, 2009). The Social Security

19

Administration indicates that a child between the ages of six and twelve should be able to develop lasting friendships with peers, understand how to work in groups, understand another's point of view, form relationships with adults other than parents, and share ideas and stories with others. 20 C.F.R. § 416.926a(i); SSR 09-5P, 2009 WL 396026, at *6. Some nonexclusive examples of limitations in this domain include having no close friends; avoiding known people or feeling anxious about meeting new people; difficulty playing games or sports with rules; difficulty communicating to others; and difficulty speaking intelligibly or with adequate fluency. 20 C.F.R. § 416.926a(i).

In assessing this domain, the ALJ confined his discussion to information about A.L.M. provided by A.L.M., his teacher, and his grandparents. R. 36–37. The ALJ noted that A.L.M.'s grandparents said that he did not have friends his age, could not make friends, did not play team sports, and got along with adults and teachers. Additionally, he was affectionate, but lacked empathy; he could understand some body language and read facial expressions; he interacted only with his brother; and he had one friend. The ALJ noted that A.L.M. said that he played games only with his brother, had one friend and had been friends with this child since preschool, and had friends at school. Lastly, the ALJ discussed information from A.L.M.'s fourth grade teacher, Ms. Carroll. She said that A.L.M. had serious problems making and keeping friends, obvious problems with verbal and nonverbal communication, and slight problems seeking attention appropriately and maintaining relevant and appropriate topics of conversation. A.L.M. could play cooperatively with other children, but did not seek out others for play. He could follow rules and obey adults.

Although the ALJ cited the relevant regulation and policy, R. 35–36, he did not explain how he evaluated A.L.M.'s ability to interact and relate to others under the guidance of the

regulation and policy. He merely recited a portion of the record, but he did not discuss how that information supported his conclusion. Considering the significant limitations identified in the statements from A.L.M., his grandparents, and his teacher, the support for the ALJ's conclusion is questionable. Without an explanation of how he reached that conclusion, the Court is unable to discern what significance the ALJ attached to A.L.M.'s lack of friends, inability to maintain relationships with his peers, and deficiencies in communication, primarily nonverbal. The Agency's policy interpretation identifies this information as relevant to a "child's ability to initiate and respond to exchanges with other people, and to form and sustain relationships with family members, friends, and others." SSR 09-5p, 2009 WL 396026, at *2. School-age children should be able to play, learn, and work cooperatively with others; sustain social exchanges and develop meaningful relationships with others; and communicate using and understanding verbal and nonverbal skills. *Id.* at *2–4. The evidence discussed by the ALJ showed significant limitations in most of these areas, and the ALJ did not explain why that evidence showed less than marked, as opposed to another, limitation.

The ALJ may have determined that other information showing that A.L.M. could function well outweighed the evidence of limited functioning. For example, A.L.M. was able to follow rules, play well with his peers, and develop relationships with adults. Considering the evidence on both sides of the scale, the ALJ needed to do more than simply recite a portion of the evidence; he needed to analyze how the policy applied to that information and explain his conclusion.

The ALJ's conclusory, two-sentence discussion of the DDS psychologists' opinions[7] on this domain, R. 37, provides no additional insight into his weighing of the relevant information

---

[7] Both DDS psychologists found that A.L.M. had less than marked limitation in interacting and relating with others, but the psychologists relied on different information showing differing levels of limitation. R.

or rationale for finding that A.L.M.'s ability in this domain was less than marked. *See Monroe v. Colvin*, 826 F.3d 176, 191 (4th Cir. 2016) (holding that conclusory analysis of medical opinions and nonspecific explanation of weight assigned to each opinion precludes meaningful judicial review).

Moreover, the ALJ did not discuss how the medical evidence impacted his assessment of this domain, and he provided no reason for this omission. The relevant medical evidence, which the ALJ discussed in other sections of his opinion, contains significant information relevant to A.L.M.'s ability to interact and relate to others. In the earliest treatment notes in the record, Dr. Norwood documented that A.L.M. had a serious difficulty making and maintaining friends and problems with nonverbal communication. R. 294–95. These problems were documented throughout the record during treatment sessions at UVA Hospital, R. 421, in many of the sessions with Ms. Pineo, R. 357, 363, 365, 367, 369, 371, 379, 404–05, 463, 464, and in the assessments by Dr. McKeegan, R. 386. Considering the facts of this case, the ALJ must conduct a fulsome analysis of the medical evidence and how it impacts his assessment of this domain. Absent such analysis I cannot find that the Commissioner's final decision is supported by substantial evidence. On remand, the ALJ should analyze all medical, opinion, and other relevant evidence and explain how they affect his assessment of the six domains.

### V. Conclusion

For the foregoing reasons, I find that the Commissioner's final decision is not supported by substantial evidence. Accordingly, the Court will **DENY** the Commissioner's motion for summary judgment, ECF No. 16, **REVERSE** the Commissioner's final decision, **REMAND** this

---

79–82, 88–91. Their review was confined to reports from teachers and grandparents as well as Dr. Norwood's diagnosis. The ALJ did not mention or reconcile the differences in their opinions.

case for further administrative proceedings, and **DISMISS** this case from the docket. A separate

Order will enter.

The Clerk shall send certified copies of this Memorandum Opinion to the parties.

ENTER: September 23, 2016

Joel C. Hoppe
United States Magistrate Judge